## SERRATO v. HOPKINS.

No. 15119—Opinion Filed May 19, 1925.

Rehearing Denied July 14, 1925.

(Syllabus.)

1. Acknowledgment—Deeds — Presumption of Validity—Acknowledgment Admittedly False.

Where it is admitted that the acknowledgment on a purported deed was false, and that the grantor in said deed never appeared before the notary public purporting to take said acknowledgment and acknowledge the execution of same, the acknowledgment is of no force and effect, and the presumption of validity ordinarily given a duly acknowledged deed does not prevail.

2. Appeal and Error—Review of Equity Case—Insufficiency of Evidence.

In all cases which were cognizable only in a court of chancery, this court on appeal has the power to consider the whole record, to weigh the evidence, and, when the judgment and decree of the trial court is clearly against the weight of the evidence, render or cause to be rendered such judgment as the trial court should have rendered.

Error from District Court, Grady County; Will Linn, Judge.

Action by Gregorio Serrato against W. A. Hopkins. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

Bailey & Hammerly, Samuel A. Boorstin and J. D. Johnston, for plaintiff in error.

Bond, Melton & Melton, for defendant in error.

CLARK, J. The parties herein will be referred to as they appeared in the trial court.

On the 28th day of August, 1922, the plaintiff began this action by filing his petition in the district court of Grady county, Okla., alleging ownership in fee of certain lands in Grady county; and alleging further that on the 30th day of June, 1922, there was filed for record a certain pretended royalty deed purporting to convey to the defendant, W. A. Hopkins, the royalty rights and interest of the plaintiff in and to the oil and

gas and other mineral rights on and under the land described in said deed. The plaintiff further alleged that the pretended royalty deed was a forgery, made without the knowledge or consent of the plaintiff, and that said pretended royalty deed, being so recorded, is a cloud upon the title, and he prays judgment canceling said deed and quieting title in plaintiff.

To this the defendant filed his answer, admitting that the royalty deed had been placed of record, and alleging that said royalty deed was a valid and sufficient conveyance and conveyed to the defendant one-eighth of all the oil and gas and other minerals in and under the lands described in plaintiff's petition. To this answer plaintiff replied, denying the validity of the royalty deed, and alleging that if such deed was valid it would be effective only for the purpose of conveying to said defendant a one-eighth part of such royalties as are reserved to plaintiff under outstanding oil and gas leases on the premises.

Upon the issues so made, the cause went to trial before the court on the 7th day of July, 1923. The court after hearing the cause made its findings of fact in favor of the defendant, and upon such findings entered judgment against the plaintiff and in favor of the defendant, quieting the title of the defendant in a one-eighth royalty interest claimed by the defendant in the lands in controversy. A motion for a new trial was filed and by the court overruled, and the case is now here upon appeal for review.

Various assignments of error are made, the first two of which are as follows:

"(1) That the judgment of the court is contrary to the uncontradicted evidence and is not sustained by sufficient evidence.

"(2) Judgment of the court is against the clear weight of evidence in said cause."

The royalty deed in question appears to have been dated on the 15th day of May, 1922, and acknowledged before Arthur Ersland, notary public, the 15th day of May, 1922, and recorded in the office of the county clerk the 30th day of June, 1922, the original of which is contained in the case-made for our inspection.

It is the contention of the plaintiff that he never signed or acknowledged said royalty deed, that he made no contract with the defendant conveying to him any interest in the land described in said royalty deed.

The notary public who took the purported acknowledgment testified as follows:

"Q. Did you live in Chickasha in May, 1922? A. Yes, sir. Q. Were you a notary public duly commissioned and acting in Grady county at that time? A. Yes, sir. Q. Some time in May or June, 1922, Mr. Ersland, did Mr. Hopkins present to you as a notary public a purported royalty deed of any kind? A. Why, he presented it in blank; yes, sir. Q. What do you mean by 'in blank?' A. Well, he just got it of the printer, you see, and I filled it out on the typewriter for him. Q. You filled out the form on the typewriter for him? A. Yes, sir. Q. Had anybody signed that royalty deed? A. No, sir. Q. Was there any signature on it? A. No, sir. Q. Did you put a certificate of acknowledgment on there? A. Yes. Q. Who did you certify appeared before you and acknowledged it? A. Well, there was nobody then. Q. I know, but in your certificate as notary, you certified that someone appeared before you and acknowledged the execution. A. Yes. Q. Who did you certify appeared before you? A. Well, the best I can remember is Gregorio Serrato. Q. Gregorio Serrato? A. Gregorio. Q. You say you filled the instrument out, the body of it, and the acknowledgment? A. Yes. Q. And then put this acknowledgment there? A. Yes. Q. Sealed it up? A. Yes. Q. Was Gregorio Serrato, Mexican Joe, there? A. No. Q. He didn't appear before you at all? A. No. Q. Was his signature, any signature, on this instrument at that time? A. No. Q. At any time after that, did Gregorio Serrato, or Mexican Joe, appear before you and acknowledge the execution of that instrument? A. Not that I remember of. Q. Did you ask him about it after that? A. Yes. Q. Did he deny signing it or admit signing it? A. He denied it."

On cross-examination the notary testified as follows:

"A. Yes, I happened to meet him on the street and I said, 'Joe, did you sell any of your lease?' He said, 'No.' I said, 'Did you sell your royalty?' He says, 'No.' I says, 'Didn't Bill Hopkins buy some of it?' And he says, 'No.' So I thought, well, the thing had been torn up, and that was all there was to it; so I never paid any further attention to it at that time. Q. When did you see him the next time about it? A. The next time. I don't remember the date, but he was running the restaurant on South Second, and I went down there. I had a man with me, and I thought I would go down and see if he wouldn't acknowledge it, and we went down to see him, but I don't know the date of that; that was after the well came in. Q. What did he say about it then? A. Well, he denied it absolutely."

The notary further testified that he had seen plaintiff's signature twice, or had taken his acknowledgment to two different instruments, and that he thought he knew plaintiff's signature, and that he supposed

the signature on the purported deed was plaintiff's.

The notary was not qualified to testify as to the signature of the plaintiff, for the reason he admitted that he did not know his signature. To the question, "As a matter of fact, you don't feel like you are qualified to testify as to his signature?" the answer was, "I wouldn't hardly want to say about that." And to the question, "Now, I hand you this exhibit No. 5; I will ask you if this is his signature?" the answer was, "It looks like it as far as I know." All of this testimony was clearly incompetent, for the reason the witness was not qualified to testify as to the signature of the plaintiff.

Exhibit No. 6 being the royalty deed in question and exhibit No. 5 being an oil and gas lease purported to be executed by Gregoria Cerrato to R. N. McClure, it is clear from the record that exhibit No. 5 was not properly admitted in evidence, for the reason that there was no proof that the plaintiff executed the same, or that the signature appearing thereon was the signature of the plaintiff. In fact, the plaintiff emphatically denied the execution of said instrument. And the instrument could have been admitted in evidence for no purpose except the comparison of the signature on said exhibit with the deed in question.

The defendant testified that after he had the royalty deed prepared by the notary public, two or three days thereafter, he went down to the restaurant of the plaintiff, who is a Mexican about 70 years old, and that plaintiff there signed the royalty deed, and that two or three days thereafter he showed the royalty deed with the signature thereon to the notary public who prepared the false and forged acknowledgment.

The notary public testified that several days after he prepared the royalty deed he saw the defendant, Hopkins, and asked him if the plaintiff had executed said deed, and the defendant stated to him that he had not, and that just as soon as he caught him he would bring him up and have him acknowledge the same. The notary further testified that the defendant did show him the royalty deed, but it was after the same had been recorded. The deed shows to have been recorded on June 30, 1922, about 45 days after it was prepared by the notary public.

The defendant testified that at the time the plaintiff signed said purported royalty deed there were several people present; but he was able to give the names of but one person present besides the plaintiff, and that was the plaintiff's son, Celso Cerrato.

Plaintiff's son testified that he was 26 years of age, and that no such transaction occurred in his presence. He further testified that he was familiar with his father's signature and that the signature on the royalty deed was not that of his father.

The record discloses that the plaintiff always signed his name "G. Serrato," or when signing his given name in full he signed it "Gregorio Serrato." The deed in question appears to be signed "Gregorio Cerrato." Plaintiff's son testified that he and plaintiff's other children signed their name "Cerrato," but that his father always signed his name "Serrato." Plaintiff testified that he learned to write his name in English "Serrato," and that he never signed it any other way. This testimony is corroborated by the record. An oil and gas lease executed by plaintiff to A. B. Cook on the 20th day of February, 1922, was signed "G. Serrato"; a deed executed by plaintiff on the 13th day of September, 1917, to O. W. Reed was signed "Gregorio Serrato"; a deed executed by O. W. Reed and wife on the 27th day of December, 1918, to plaintiff was executed to "G. Serrato"; three tax receipts issued to plaintiff January 20, 1921, by the county treasurer of Grady county, Okla., were issued to "G. Serrato"; a letter from the Maxwell Investment Company, Kansas City, Mo., dated February 9, 1921, was addressed to the plaintiff as "Gregory Serrato"; a check drawn by plaintiff on the Chickasha National Bank, paid to the order of cash, in 1921, was signed "G. Serrato"; a check of June 9, 1921, drawn on the Chickasha National Bank payable to the order of Price & Venable in the sum of $115 was signed "G. Serrato"; a check dated February 4, 1918, drawn on the First National Bank of Chickasha, payable to the Chickasha Gas & Electric Company in the sum of $8 was signed "G. Serrato"; a check dated January 15, 1921, drawn on the First National Bank of Chickasha in the sum of $1 was signed "G. Serrato"; a note executed by plaintiff December 30, 1916, payable to the First National Bank, Chickasha, Okla., in the sum of $3,000 wa signed "Gregorio Serrato"; and a contract for sale of real estate entered into by plaintiff with Will Miller on the 14th day of March, 1917, was signed by the plaintiff "Gregorio Serrato." The record contains no signature of the plaintiff in which his name was signed "Cerrato," except exhibits No. 5 and No. 6, and no witness testified that plaintiff signed exhibit No. 5, and the plaintiff emphatically denied signing the same. The defendant, Hopkins, was the only witness that testified that the plaintiff signed exhibit No. 6, same be-

ing the deed in question. A banker with whom the plaintiff had done business for many years testified that he had never known of the plaintiff signing his name "Cerrato." but that plaintiff always signed "Serrato."

The testimony of defendant as to the contract made with the plaintiff for the execution and delivery of the purported royalty deed is indefinite and uncertain and fails to disclose any meeting of the minds of the parties. The testimony of defendant as to the consideration is very indefinite and uncertain and of a doubtful character.

Defendant testified as follows:

"Q. Bill, I will ask you if you recall the circumstances leading up to the execution of this royalty deed here? A. Yes, sir. Q. In 1921, did Joe request you to pay some taxes for him? A. Well, he wanted the money to pay them with; yes, sir. Q. Did you give it to him? A. Yes, sir. Q. Did he bring the receipts back to you? A. Yes, sir. Q. Here are some instruments marked 'Exhibits 1, 2, and 3.' Are those the receipts he brought back to you? A. Yes, sir. Q. Now, along about that time, Bill, did he bring this letter here, Exhibit 4, to you and ask you to get some insurance for him on his farm? A. Yes, sir; he paid the premium with part of this money. Q. Part of the money that he got from you? A. Yes, sir. Q. Do you know how much it was? A. I don't; not exactly. Q. Now, in 1922, did you have any agreement with Joe about executing an oil lease, or deed for that money you let him have? A. Yes, sir. Q. When did you first talk to him about it? A. Well, about—he was getting further and further behind and leases were picking up a little and pretty valuable, and I asked him for the lease. Q. Asked him for a lease on it? A. Yes, sir; and he gave me this lease that I have there. Q. Now, Bill, did that lease represent the money that you let him have to pay these taxes and insurance? That was cash out of your pocket, I understand? A. Yes, sir. Q. And the money that he had in his restaurant business there was owing to the firm of Hopkins and Venable? A. Yes, sir. Q. Now, did he give you an oil and gas lease for that money, Mr. Hopkins? A. Yes, sir. Q. I will hand you exhibit No. 5, and I will ask you to state if that is the oil and gas lease he gave? A. Yes, sir. Q. That bears date of the 7th of May? A. Yes, sir. Q. Is that the date he gave it to you? A. No, he gave it to me later. Q. Gave it to you later? A. Yes, sir."

We here state that the oil and gas lease dated May 7, 1922, referred to as exhibit No. 5, was not an oil and gas lease executed to the defendant in this cause, but was an oil and gas lease executed to one McClure; and the record fails to disclose that the defendant had any interest in said oil and gas lease, and further fails to show that plaintiff executed the same.

Continuing the testimony, the defendant testified as follows:

"Q. After you got that lease, now, Bill, did you find out that there was already a lease on it that had been put up in escrow and not recorded? A. This was the lease. I got this lease. Q. You got this lease now from Joe? A. Yes, sir. Q. Now, then, after Joe delivered to you that lease shortly after that, there was an escrow lease filed for record on the same land, wasn't there, by this man Cook? A. Yes, sir. Q. The Cook lease? A. Yes, sir. Q. Now, then, after you found out that the Cook lease covered that land, you never did have this lease recorded, did you? A. No, sir. Q. Then what conversation, if any, did you have with Joe with reference to the Cook lease being prior to this lease. and this lease not being worth anything? Did you go and see him about it? A. Yes, he agreed to give them this lease, but I had it. Q. Joe had agreed? A. Yes. Q. Well, he had already executed a lease to Cook now, hadn't he? A. Yes. Q. Now, then, growing out of that, what was done with reference to you taking the deed to the royalty? A. That is what I got instead of the lease. Q. He gave you the royalty deed instead of the lease? A. Yes, sir. Q. Now, then, the lease on this same land was given to Cook to drill the well, wasn't it? A. Yes, sir. Q. Did you see Joe sign this instrument here, the oil lease? A. No, sir. Q. You didn't see him sign that? A. No, sir. Q. Did you see him sign this instrument here, the royalty deed, and the exhibit No. 6? A. Yes, sir. Q. Where did he sign it? A. In his restaurant. Q. Here in Chickasha? A. Yes, sir. Q. When was it signed Bill? A. Well, I couldn't say; possibly three or four days, maybe a week after it was made out. Q. After it was made out. Now, who was present at the time it was signed, do you know? A. No, there was a number present around there. Q. Do you know any of them? Know their names? A. Why, I believe his boy was in there, Celso. Q. Who else? A. And I couldn't recall. I don't remember; quite a few in there all the time, when it was signed. Q. Did you take the instrument in for him to sign? A. Yes, sir. Q. Anyone with you? A. No, sir. Q. It was signed in Joe's place of business? A. Yes, sir. Q. How long do you say it was after Ersland had prepared it? A. Maybe three or four days. Q. Three or four days, or a week, possibly? A. It wasn't long. Q. Did Ersland put his acknowledgment on it before Joe signed it? A. Yes, sir. Q. Now, after he had signed it, did you take the deed back to Ersland and show it to him? A. Yes, sir. Q. How long after it was signed before you did that,

Bill? A. The day Joe signed it. Q. The day that he signed it? A. Yes, sir. Q. How long was that after it had been prepared? A. Possibly three or four days. Q. Three or four days? A. Yes, sir."

According to the testimony of the defendant, Hopkins, the failure of the oil and gas lease, marked exhibit No. 5, the execution of which is denied by the plaintiff, said purported lease being made to one McClure, was the consideration for the royalty deed in question. We must, therefore, conclude that there was no consideration then given for the purported royalty deed.

Testimony of the defendant in regard to the money furnished the plaintiff was supported by a memorandum which was introduced over the objection of the plaintiff, in words and figures as follows:

"Jan. 1921, to Mx Joe

| | | |
|---|---|---|
| Cash | sw | $397.00 |
| " | " | 71.00 |
| | | $468.00 |

"To pay taxes & assmts & insurance. Due WAH the total amount $468.00.

"On back of exhibit:

"Mx Joe G. Serrato to W. A. Hopkins. Paid by royalty deed May 20 22 W. A. Hopkins."

The defendant testified that at the time this money was furnished plaintiff, or about that time, he brought to him a letter demanding payment on insurance. The memorandum introduced shows the date of January, 1921, and the letter appears to have been dated at Kansas City, Mo., February 9, 1921, at least nine days after the money had been furnished the plaintiff to comply with the request in said letter. This conflict in the testimony stands unexplained.

Taking the testimony of the defendant in its most favorable light, it fails to disclose that there was any meeting of the minds of the plaintiff and defendant for the execution of the purported royalty deed. The testimony of the defendant in answer to the question as above set out, "Q. Now, then, growing out of that, what was done with reference to you taking the deed to the royalty? A. That is what I got instead of the lease," clearly fails to show any statement or agreement on the part of the plaintiff to execute said royalty deed; just a mere statement of the defendant that that was what he got fails to disclose any agreement on the part of the plaintiff to execute said deed.

The expert witnesses that testified did not agree as to whether or not the signature of

the purported royalty deed was the handwriting of the plaintiff; some of them testified positively it was not, and some testified that it looked to be the handwriting of the plaintiff; one witness in particular testified that it was the handwriting of the plaintiff, but admitted that a few days prior to the trial the questioned document was presented to him by the attorney for plaintiff and that he stated to said attorney positively that it was not the signature or handwriting of the plaintiff.

The false and forged acknowledgment on the deed, being admitted as false by the defendant, and as shown by the testimony of the notary public, is a fact and circumstance which has great weight with this court in determining the issues in this case. The general rule is that the execution of a deed when regular creates a presumption that the deed expresses the intent of the parties, but a deed executed. if executed at all, under circumstances disclosed by the record in this case creates no such presumption. Here we have a fairly well educated man, and a business man of experience, grantee, the grantor an uneducated Mexican, who is able to sign his name and that is about all. The grantee, being the defendant, admitted that he took the deed to the notary public, had it filled out, had the notary public put his seal upon it and certify that the plaintiff, the grantor, had appeared before the notary and acknowledged the instrument as his free and voluntary deed, all of which was false and untrue. It is uncontradicted the certificate and seal of the notary was all placed upon the deed before the alleged signature of the grantor appeared thereon; the grantor never appeared before the notary public. Under these facts and circumstances the certificate of the notary is of no force and effect, and we have a purported deed that has never been acknowledged.

The plaintiff contends he never executed the deed; that he never signed his name "Cerrato"; that he always signed his name as "Serrato." This testimony of the plaintiff is corroborated throughout the record. The record discloses that he was known and that he owned property the title of which was in the name "Serrato"; that he paid taxes and his name was spelled "Serrato," and that his business with the banks of Chickasha from 1916 to 1922 was conducted under the name of "Serrato."

From these facts and circumstances we must conclude that the signature upon the deed is a forgery. We have the testimony of the defendant that the deed was signed by

the plaintiff in the presence of several persons, but defendant could give the name of only one, that being the son of the plaintiff, and this son testified positively that his father did not execute it in his presence.

After a careful consideration of the entire record we are of the opinion that the trial court erred in finding for the defendant and against the plaintiff, and that the finding of the trial court is clearly against the weight of the evidence. We have been favored with several able briefs amicus curiae on the construction of the royalty deed in question, but having reached the conclusion that said royalty deed does not convey any interest, we deem it unnecessary to pass on that question. This court has held that in a suit in equity, where it is clearly shown that the finding and decree are clearly against the weight of the evidence, that the decree is erroneous, then this court will consider the entire record of said cause, weigh the evidence, and render such judgment as the trial court should have rendered.

Section 801, Comp. St. 1921, provides in part:

"When a judgment or final order shall be reversed on appeal, either in whole or in part, the court reversing the same shall proceed to render such judgment as the court below should have rendered."

This rule has been followed by this court in a number of well-considered opinions. Johnson et al. v. Perry et al., 54 Okla. 23, 153 Pac. 289; Shock et al. v. Fish, 45 Okla. 12, 144 Pac. 584; Wimberly v. Winstock et al., 46 Okla. 645, 149 Pac. 238; Tucker et al. v. Thraves, 50 Okla. 691, 151 Pac. 598; Britton v. Morris, 59 Okla. 162, 158 Pac. 358; Prentice v. Freeman, 76 Okla. 260, 185 Pac. 87. In the last-cited case the court in the third syllabus said:

"In all cases which were cognizable only in a court of chancery, this court on appeal has the power to consider the whole record, to weigh the evidence, and, when the judgment of the trial court is clearly against the weight of the evidence, render or cause to be rendered such judgment as the trial court should have rendered."

By authority of the statutes and cases herein cited we feel that the judgment of the trial court should be reversed and remanded, with directions to enter judgment for the plaintiff, canceling said deed.

This cause is, therefore, reversed and remanded, with directions to enter judgment for the plaintiff canceling said purported royalty deed, and for such other proceedings as may be necessary to protect the rights of the parties in conformity with this opinion.

NICHOLSON, C. J., BRANSON, V. C. J., and HARRISON, MASON, PHELPS, LESTER, and HUNT, JJ., concur.

Note.—See under (1) 18 C. J. p. 422 (1926 Anno). (2) 4 C. J. pp. 897, 1192.